tiff's constitutional challenge to § 1(g) must fail.

William R. Merryman, Kansas City, Mo., for plaintiff.

Mark P. Johnson, Alison Armstrong, Kansas City, Mo., for defendant.

**Karen ROSS, Plaintiff,**

v.

**KANSAS CITY CABLE PARTNERS, d/b/a American Cablevision, Defendant.**

**No. 90–0805–CV–W–8.**

United States District Court, W.D. Missouri, W.D.

June 1, 1992.

## MEMORANDUM OPINION AND JUDGMENT

STEVENS, District Judge.

Plaintiff alleges race discrimination and retaliatory discharge, both in violation of 42 U.S.C. 2000e–5 ("Title VII"). The case was tried to the court in a trial lasting two days. Pursuant to Fed.R.Civ.P. 52, the court now makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

1. Plaintiff, Karen Ross, began her employment with defendant American Cablevision in October, 1984. She began as a customer service representative and was promoted in January, 1988 to the position of Cable Store Supervisor for American Cablevision's Olive Street store. As a Cable Store Supervisor, Ross' supervisor was Anita Johnson, Assistant Manager of Cable Store Operations. Ms. Johnson's supervisor in turn was Geri Watts, Manager of Cable Store Operations.

2. Each of American Cablevision's stores conducts an inventory on an annual basis. As Cable Store Supervisor, Ross was responsible for the preparation of the final inventory sheets. Prior to the 1988 yearend inventory, Ross attended a two hour training session on taking inventory.

3. Following that inventory Ross was informed of a note written by Watts. The note was written to Karen Watmore and Rose Dippel, and it concerned Ross' inventory sheets which contained some mistakes. The note stated:

"Karen and Rose—

I just wanted you to see the last page of the inventory Karen Ross sent me. Can you believe it!!

What can I say—you buy 'em books & buy 'em books!!

Geri"

The note was intercepted by Ruth Gilliam who forwarded it to Ross. Gilliam and Ross are both black.

4. Ross became very upset when she received the note because she believed it was racially derogatory. Ross reported the note to her supervisor, Anita Johnson, who is also black.

5. After discussing the note, Ross and Johnson went to the Holmes Street location of American Cablevision to meet with Vicky Heider, Director of Human Relations for defendant. At that meeting they showed Heider the note and plaintiff expressed her concern and distress. Heider then asked Watts to come into the room, at which time Watts immediately apologized to Ross for the note and stated that she did not mean it to be racially derogatory.

6. Watts had verbally made the "buy 'em books" expression at work on other occasions in reference to non-minorities. According to Watts' testimony, the expression was one that she heard many times when she was growing up and it meant that somebody did not understand or follow something after it had been explained.

7. In response to this incident, Watts gave Ross a formal written apology on January 30, 1989. Watts was also told by her superiors that the note was inappropriate and she was warned that future similar conduct could result in further disciplinary steps.

8. Ross' relationship with Watts thereafter was professional and cordial, although Ross testified that this was because she still had to work with Watts and therefore get along with her. Heider later followed up with Ross and asked her if she thought the matter had been resolved. Ross indicated that it had.

9. Heider also told Ross that the position of Accounts Receivable Supervisor was open and encouraged her to apply for it. After this conversation and during the process of accepting applications for the position, Heider asked Leandrea Johnson, Human Resources Coordinator, on numerous occasions whether Ross had applied for the job and also had Johnson contact Ross to find out whether she was going to apply.

10. On February 9, 1989, Ross applied for the position of Accounts Receivable Supervisor. Among those who also applied was Melynda Postlethwait (a white female). Ross received the promotion which became effective on March 7, 1989. Her supervisor in the new position was Jackie Woods.

11. The outgoing Accounts Receivable Supervisor was Jeannine Vaughn who had been promoted to the position of Business Manager of Cable Advertising. When Ross later quit American Cablevision in August, 1989, the Accounts Receivable Supervisor position was awarded to Postlethwait. Vaughn and Postlethwait are close friends, as evidenced by Vaughn being the Maid of Honor in Postlethwait's wedding. Before the Accounts Receivable Supervisor position was awarded to Ross, Vera Nevels, Accounting Clerk, heard Vaughn say that if a certain person was given the position Vaughn was not going to train her.

12. Ross had no formal accounting experience or training prior to becoming Accounts Receivable Supervisor. Similarly, neither Vaughn (her predecessor) nor Postlethwait (her successor) had accounting experience or training prior to accepting the position.

13. Ross' training for the position was strictly "on-the-job" and, aside from introductory training from Vaughn on Ross' first day on the new job, the training was provided on an "as needed" basis upon Ross requesting help. While the testimony was somewhat conflicting on the exact amount of training Ross received, the record supports that, in general, when Ross sought out help she received assistance from various individuals on different occasions for varying lengths of time.

14. Ross received assistance from Vaughn as the predecessor to her position several times during Ross' first month on the job and on other occasions thereafter. Specifically, Vaughn talked with Ross numerous times about how to prepare the

monthly cash reconciliation, which is an important part of the Accounts Receivable Supervisor's job and was something that Ross was having difficulty with. It is clear, however, that Vaughn did not spend a great deal of time with Ross when Ross sought her out and that Ross was sometimes unable to locate Vaughn to ask questions of her. Vaughn's unavailability apparently was caused in part by her having to learn the responsibilities of her new job as well.

15. Ross was also trained by her supervisor, Jackie Woods. In particular, Woods sat down with Ross on three separate occasions to help her understand the cash reconciliation. Ross admitted at trial that Woods never refused her requests for assistance.

16. Ross also asked questions of and received help from Bill Schilling, Data Processing Manager, Tony Smith, Computer Operator, Farideh Amighi, Staff Accountant, and Gayla Hale, Purchasing Clerk. The assistance from these individuals, however, was brief and limited in its scope.

17. Ross also attended a two day training seminar on cable data called "Pay 80 Procedures." Ross testified, however, that she benefited little from the seminar because the course was too advanced for her.

18. Ross met with Woods on August 31, 1989 to discuss her first semi-annual review in the Accounts Receivable Supervisor position. Prior to that meeting Ross filled out a Self–Appraisal form. Item 6 on the form asked, "What additional skills, knowledge, or training would help you perform your present job more effectively?" Ross answered this question by writing "no comment." Item 7 asked, "What could your manager do to help you perform your job more effectively?" Again, Ross answered this question by writing "no comment."

19. In general, Ross' semi-annual performance review was below average. In particular, it recognized that the Accounts Receivable department was failing to meet the scheduling deadlines for completing cash reconciliations. The review also noted that Ross had called in sick seven times in ten months, as well as taken "numerous hours off to attend to personal business," and that Ross needed to do a better job as a role model for her department's attendance.

20. The review also noted and Woods underscored in their meeting that this was a preliminary review based only on Ross' first six months in the position: "Karen is still learning her full job responsibilities. This job was a big step for her. She still has a lot to learn on how the entire billing system interrelates. I'm confident she can grow into the needed skills." Later on Woods wrote again:

> This job is a big step for Karen. I feel that she is tackling it with energy and a good attitude. Karen is struggling to grow into the skills and responsibility required. I believe she can do it! Good determination! Karen, I want you to succeed—but you're the one who has to do it.

21. During the review Woods also mentioned to Ross that if Ross believed she would be unable to perform the responsibilities of Accounts Receivable Supervisor then Woods would help find a position for her in another department. Ross believed this was an invitation for her to quit.

22. At the end of the review Ross told Woods that she was quitting, then took the evaluation and left.

23. For several days after the review Woods and Heider, the Director of Human Resources, tried to contact Ross to encourage her to reconsider leaving American Cablevision. They also had Leandrea Johnson attempt to contact her for the same purpose. Ross never returned any of their calls.

## CONCLUSIONS OF LAW

Ross claims race discrimination and retaliatory discharge both in violation of Title VII. To succeed on a claim of race discrimination, Ross must show that (1) she is a member of a protected class, (2) she was capable of performing the job, and (3) she was discharged from the job. *Johnson v. Bunny Bread Co.*, 646 F.2d 1250, 1253 (8th Cir.1981). To establish a claim of retali-

atory discharge she must prove that (1) she engaged in statutorily protected participation, (2) she was subjected to adverse employment action, and (3) a causal connection exists between the two. *Womack v. Munson,* 619 F.2d 1292, 1296 (8th Cir.1980), *cert. denied,* 450 U.S. 979, 101 S.Ct. 1513, 67 L.Ed.2d 814 (1981).

Since Ross admits that she quit her job at American Cablevision, in order to establish either prima facie case above she must prove as an initial matter that she was constructively discharged. The standard for proving constructive discharge is clear—it occurs when "an employer deliberately renders the employee's working conditions intolerable and the actions of the employer are intended to force the employee to quit." *Hervey v. City of Little Rock,* 787 F.2d 1223, 1231 (8th Cir.1986).

Therefore, Ross must show not only that her work environment was intolerable, but that American Cablevision deliberately rendered it so in order to force her to quit. *See Bunny Bread,* 646 F.2d at 1256 ("To constitute a constructive discharge, the employer's actions must have been taken with the intention of forcing the employee to quit."). In addition, "[a]n employee may not be unreasonably sensitive to his [or her] working environment. A constructive discharge arises *only when a reasonable person would find conditions intolerable.*" *Id.* at 1256 (emphasis added).

The court finds that Ross has failed to show under the facts of this case either that her work environment was intolerable or that American Cablevision deliberately rendered it intolerable to force her to quit. Because the court finds, therefore, that plaintiff was not constructively discharged, it need not venture further into the elements of plaintiff's race discrimination and retaliatory discharge claims.

Karen Ross' work environment at American Cablevision, viewed objectively, was not intolerable. The amount of training that she received at American Cablevision was not intolerable.[1] If it was, then the court would venture to guess that the great majority of work environments in this country would be deemed intolerable. American Cablevision did not have a formal training program for the Accounts Receivable Supervisor position. Like many positions of employment nowadays, the training was on-the-job and it was provided only upon Ross' initiative when she sought out answers to questions. Ross might not have received all the training that she wanted or all that would have been helpful to her, and perhaps she had to search harder for help than she would have preferred, but these unfortunately common shortcomings in employment training do not render the workplace intolerable.

Ross sought and received help from at least six individuals at American Cablevision. She was trained initially by her predecessor, Jeannine Vaughn, and continued to seek and get answers from Vaughn, albeit brief answers, to her questions thereafter. In particular, Vaughn answered numerous questions from plaintiff over time involving the monthly cash reconciliation. Ross also received training from her supervisor, Jackie Woods, whenever Ross sought it, including on cash reconciliations. In fact, Ross testified that Woods never refused her requests for assistance. Finally, Ross sought and received help from a handful of other American Cablevision employees on certain discrete topics. While the amount of training that Ross received may not have been ideal, it certainly was not intolerable.

Moreover, while plaintiff claims that her lack of an accounting background necessitated extra training for her, the court notes that neither her predecessor nor her successor had accounting experience or training prior to their filling the position.

The court finds it curious that Ross claims American Cablevision rendered her workplace intolerable through a lack of training, yet she failed to mention any such concern in the self-appraisal form which specifically asked her about her training. On July 26, 1989, in response to the question, "What additional skills, knowledge, or

---

1. The fact that plaintiff had to retrieve monthly printout reports from the data processing department, as did other employees, was also not intolerable.

training would help you perform your present job more effectively?" Ross wrote "no comment." Again, in response to the question, "What could your manager do to help you perform your job more effectively?" she wrote "no comment."

Ross also contends that she was constructively discharged by virtue of her August 31, 1989 performance review with Jackie Woods. The court does not agree. The overall review was undoubtedly not as positive as Ross would have liked. Specifically, Woods noted Ross' need for improvement in meeting scheduling deadlines, including preparing accurate cash reconciliations before the monthly cut-off date, and in setting a better attendance example for her staff. Woods also stressed, however, that the review was based only on Ross' first six months in the position, that it was thus only a preliminary review, and that Ross could be expected to grow into the position.

Moreover, Ross also received a favorable review in other areas: under the "Company Image" section Woods wrote, "Image with customers is very good"; in the area of customer service Woods wrote, "Karen exercises good judgment with customers to aid in customer satisfaction. Karen deals well with customers"; and in the section for human relations ability Woods wrote, "I am proud of Karen. She has handled difficult personnel situations well." Woods' concluding comments in Ross' evaluation, in fact, were quite positive:

> This job is a big step for Karen. I feel that she is tackling it with energy and a good attitude. Karen is struggling to grow into the skills and responsibility required. I believe she can do it! Good determination! Karen, I want you to succeed—but you're the one who has to do it.

The court thus finds that while Ross' first performance evaluation as Accounts Receivable Supervisor may not have been glowing, it was far from creating an intolerable work environment.

Nor did Woods' comment regarding other possible positions in the company create an intolerable situation designed to force Ross to quit. *See Hervey v. City of Little Rock*, 787 F.2d at 1231. Woods merely indicated that if Ross believed she would be unable to perform the responsibilities of Accounts Receivable Supervisor then Woods would help find a position for her in another department. Rather than forcing her to quit, the comment encouraged her to stay with American Cablevision if she decided that she was not suited for her current position. Further indication of the fact that American Cablevision did not force Ross to quit is the fact that after the August 31, 1989 review Woods, Vicky Heider, the Director of Human Resources, and Leandrea Johnson all tried to contact Ross to encourage her to reconsider leaving the company.

Finally, while it is not specifically plead by Ross, implicit in her theory of the case is the contention that she did not personally get along with her predecessor, Jeannine Vaughn, as well as her successor, Melynda Postlethwait, did and that this disparity created an intolerable environment for her. It is a fact that Vaughn and Postlethwait are close friends. It is also a fact that Postlethwait initially applied for the Accounts Receivable Supervisor position that later was awarded to Ross. It is not difficult to surmise that Vaughn hoped her friend would get the promotion.

Intraoffice relationships and the feelings that they engender, both positive and negative, are virtually part and parcel of the office dynamic. They are also virtually impossible for courts to regulate. This court, therefore, will not create a cause of action out of this dynamic where one does not independently exist. Because Ross has failed to show that she was constructively discharged through lack of training or through her performance evaluation, it is hereby

ORDERED that judgment is entered in favor of defendant and against plaintiff on plaintiff's claims of race discrimination and retaliatory discharge in violation of Title VII of the Civil Rights Act of 1964.